# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 17, 2003 Session

## STATE OF TENNESSEE v. BRIAN LARICE CURETON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-1008     Cheryl Blackburn, Judge**

---

**No. M2002-00835-CCA-R3-CD - Filed October 8, 2003**

---

Following a jury trial, Defendant, Brian Larice Cureton, was convicted of one count of first degree felony murder and one count of aggravated child abuse. The trial court sentenced Defendant to life imprisonment with the possibility of parole for the felony murder conviction. Following a sentencing hearing, the trial court sentenced Defendant to twenty-five years imprisonment for the aggravated child abuse conviction as a Range I offender and ordered the sentence for aggravated child abuse to run concurrently with Defendant's life sentence. Defendant now appeals his convictions and sentencing alleging (1) that the evidence is insufficient to support Defendant's convictions for first degree felony murder and aggravated child abuse beyond a reasonable doubt; (2) that the trial court erred in not allowing Defendant to cross examine Kinoltra Ewing about her willingness to take a polygraph test; (3) that the trial court erred in not redacting portions of Defendant's statement to the police; (4) that the trial court erred in not instructing the jury on facilitation of aggravated child abuse and felony murder as lesser included offenses; (5) that the trial court erred in permitting the State's expert witness to offer opinions outside her area of expertise; and (6) that Defendant's sentence for aggravated child abuse was excessive. After a thorough review of the record and the arguments and briefs of counsel, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Ross E. Alderman, District Public Defender; William J. Steed, Assistant Public Defender, on appeal; C. Dawn Deaner, Assistant Public Defender, at trial; and Clark B. Thornton, Assistant Public Defender, at trial, for the appellant, Brian Larice Cureton.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bernie McEvoy, Assistant District Attorney, and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

At 7:45 a.m. on Friday, April 6, 2001, Angel Reynolds brought her four-year-old son, Jemond Reynolds Cureton, the victim in this case, to the emergency room at Tennessee Christian Medical Center. Dr. Jennifer Eisenhour testified that when the victim arrived he was lethargic and limp with a severely extended stomach. Although he was conscious, the victim was unable to respond to questions or follow commands. The emergency staff administered oxygen and then attempted to insert an IV. The victim's veins, however, had collapsed from shock. While the emergency staff was trying to locate a vein, the victim stopped breathing and then his heart ceased beating. The staff was not able to revive the victim, and he was pronounced dead at 9:36 a.m.

Ms. Reynolds testified that the victim had spent the nine days prior to his death with Defendant and his girlfriend, Kinoltra Ewing. Defendant also had custody of his daughter, Mackenzie. Neither Ms. Reynolds nor Ms. Ewing was Mackenzie's mother. Ms. Reynolds said that Defendant was in and out of the victim's life until 2000 when Ms. Reynolds moved back to Nashville. At that time, Defendant expressed an interest in developing a relationship with his son, and the victim began spending alternating weekends with Defendant and Ms. Ewing. Later that year, Ms. Reynolds said that she decided to join the Tennessee National Guard which would require her participation in a nine- to sixteen-week basic training program. Ms. Reynolds and Defendant agreed that Defendant would have temporary custody of his son during that period. In order to accustom the victim to his new living arrangements, the child was spending more time with his father immediately prior to his death.

Ms. Reynolds described the victim as very energetic and talkative with a healthy appetite. Before he began staying with Defendant on a regular basis, he was completely toilet trained. While he was at Defendant's house, however, the victim had frequent accidents in his clothing. Ms. Reynolds said that she had discussed this problem with Defendant, and, on one occasion, Defendant responded hysterically, saying that Ms. Reynolds had to come get the child because Defendant did not know how to deal with the victim's bathroom accidents.

Ms. Reynolds testified that on Thursday morning Defendant called her while she was at her parent's house and asked her to watch the victim and Mackenzie while Defendant went to a job interview. They arranged for Defendant to bring the children to Ms. Reynolds' parents' home. Ms. Reynolds said that when the children arrived around 9:00 or 9:30 a.m., the victim did not greet her as he usually did with a kiss and a hug but simply sat down in front of the television. Ms. Reynolds offered the children a snack, and the child ate a few crackers. Later, Ms. Reynolds and Defendant took the children to Ms. Reynolds' apartment where a friend was waiting to braid Defendant's hair. While they were there, Ms. Reynolds fixed lunch for the children. Although he drank all of his juice, the victim only managed to eat a portion of a hot dog and a few chips. Ms. Reynolds said she thought the victim was sick and checked his forehead for fever but the child's brow was cool. Defendant left with the children to pick Ms. Ewing up for lunch. The victim hugged and kissed Ms. Reynolds good-bye.

Ms. Reynolds testified that later that evening Defendant and Ms. Ewing called her on a three-

way call about 9:30 or 10:00 p.m. and told her that the victim was crying and asking for Defendant who was over at a friend's house. A few minutes later, Ms. Ewing called her back, and Ms. Reynolds talked to the victim, telling him to calm down and go to bed.

Ms. Reynolds testified that on Friday morning Ms. Ewing called her around 5:30 a.m. and told her that Defendant had not come home Thursday night. Ms. Ewing asked Ms. Reynolds to watch the victim and Mackenzie so that she could go to work. Ms. Reynolds arrived at Defendant's home around 7:30 or 8:00 a.m. and immediately noticed that her son could barely walk. When Ms. Reynolds picked him up, she noticed that the victim's stomach was swollen and hard. Ms. Reynolds immediately took her son to the emergency room, arriving around 7:45 a.m.. Defendant and Ms. Ewing arrived at the hospital about thirty to forty-five minutes later. When the doctor told Ms. Reynolds and Defendant that the victim had died, Defendant screamed and began hitting the door.

Ms. Reynolds said that the police first approached her while she was at the funeral home and asked her and Defendant to accompany the officers to the station for questioning. Ms. Reynolds testified that on the way Defendant was very upset and said over and over in a loud voice that he did not do anything and that he was not going to jail.

On cross-examination, Ms. Reynolds said that Ms. Ewing had not mentioned that the victim was vomiting Thursday night in either of her telephone calls. When Ms. Reynolds told Ms. Ewing that she was going to take the victim to the hospital on Friday morning, Ms. Ewing appeared surprised. Ms. Reynolds said that the victim's stomach was not swollen Thursday morning. She did not remember telling Detective Smith that the victim's appetite was good that morning.

Ms. Reynolds testified that she did not worry about leaving the victim with Defendant and Ms. Ewing. Ms. Reynolds also testified that both Defendant and Ms. Ewing appeared concerned while they waited at the hospital for word on the victim's condition.

Ms. Ewing next testified that she met Defendant in 1999 when she was eighteen and he was twenty-one. Defendant was Ms. Ewing's first serious boyfriend, and the couple lived together for a few months until Defendant moved to Milwaukee. When he returned, Defendant and Ms. Ewing resumed their relationship and were living together when the victim died. Ms. Ewing said that Defendant had four children, but only Mackenzie lived with her father. Ms. Ewing testified that the victim spent the night at Defendant's home periodically and had been staying with Defendant and Ms. Ewing a couple of days before he died. Because he did not have a job at the time, Defendant watched the children during the day while Ms. Ewing was at work.

Ms. Ewing said that she arrived home from work around 5:30 p.m on Wednesday. After dinner, the victim soiled his clothes. Ms. Ewing said that she told the victim to take off his pants and underwear and then hit him three times on his buttocks with a belt. Defendant then struck the victim twice with the belt in the same spot. After the victim took a bath, Defendant continued the child's punishment. Ms. Ewing testified that Defendant taped two medium sized cans of food to the victim's hands and made him stand in a corner of the den, facing the wall, with his arms

outstretched. Defendant then went into his bedroom to watch television.

Ms. Ewing said that the victim stood in the corner between thirty minutes and an hour while she sat on the couch watching television. Ms. Ewing said she noticed that the victim's arms were trembling after awhile, and he was bending backwards as if he were going to tumble over. Ms. Ewing said she told Defendant that the victim's arms were shaking, and he replied "good". The victim then started waving his arms around, trying to loosen the tape that held the cans to his hands. One of the cans eventually fell off. Ms. Ewing said that the victim picked the can up and threw it toward the couch where Ms. Ewing was sitting with Mackenzie in her lap.

Ms. Ewing told Defendant that the victim had thrown one of the food cans at Mackenzie, and Defendant came into the den. Ms. Ewing said that she could tell Defendant was angry from his expression. Defendant walked over to his son and untaped the remaining can from the child's hand. When Defendant set the can down on the floor, the victim appeared confused. Defendant then grabbed the victim by his shirt and dragged him over to the couch. Ms. Ewing said that Defendant kept asking the victim why he threw the can, and the child replied that he did not know. Defendant sat down on the couch and pulled the victim toward him until the child was only a couple of inches away from Defendant. Defendant asked his son again why he threw the can. When the victim still did not answer, Defendant closed his hand in a fist and pulled his arm back until his fist was even with his shoulder. Ms. Ewing turned back to the television and when she looked back at Defendant, his fist was against the victim's abdomen, just below the sternum. The victim stumbled back three of four paces. Defendant told the victim that he loved him and then told the child to go to bed. Ms. Ewing said that she was watching television during the incident and admitted that she did not intercede on the victim's behalf.

Ms. Ewing said that she did not observe any unusual behavior in the victim on Thursday morning. Ms. Ewing also did not notice any change in the victim's appetite because the children usually did not eat breakfast. Defendant drove Ms. Ewing to work on Thursday morning because his car was out of gas. Ms. Ewing said that Defendant and the children arrived to take her to lunch around 2:00 p.m., and the victim was asleep in the backseat. Defendant and Ms. Ewing ate a fast food meal in the car, but the victim did not eat. Defendant told Ms. Ewing that the victim and Mackenzie had already had lunch. While they ate, one of Ms. Ewing's friends stopped by the car and said "hi" to the victim who did not respond. Since it was unusual for the victim not to respond to greetings, Ms. Ewing looked at the victim and noticed for the first time that he had dried blood on his lip. She went into her office building to get a damp paper towel and cleaned the child's face.

Ms. Ewing testified that she got home from work around 5:30 p.m on Thursday. She and Defendant stood in the front yard talking while the children played in their room. Defendant left to visit friends, telling Ms. Ewing that he would be home around 10:30 p.m.. When the victim discovered that his father was gone, he began crying. Ms. Ewing said that she called Defendant and told him to come home, but Defendant refused. The victim then soiled himself, and Ms. Ewing called Defendant again to tell him about the accident and Defendant spoke with the victim. After Defendant hung up, Ms. Ewing shoved the victim in the chest with her hand, and the child fell back

against the wooden arm of the couch. Ms. Ewing then retrieved a belt and struck the victim three times in the buttocks. Following this incident, the victim vomited twice, and Ms. Ewing again called Defendant to ask him to return home. Defendant refused and told Ms. Ewing to feed the victim. She fixed a hot dog but the victim vomited again as soon as he took a bite, so she sent the child to bed.

Around 2:00 a.m. Friday morning, the victim fell out of bed. Ms. Ewing went into his bedroom and told him to get back in bed. Ms. Ewing next woke at 5:00 or 5:30 a.m. Ms. Ewing called Ms. Reynolds to come get the children because Defendant had not come home that night. The victim came into the den and asked for water. The child climbed up on the couch and lay down next to Ms. Ewing. Ms. Ewing rubbed the victim's stomach because he said it hurt. When she stopped, the victim complained again about the pain, and Ms. Ewing continued rubbing. Ms. Ewing admitted, however, that she was not really paying attention to the victim and did not notice that his stomach was swollen. Eventually, she gave the victim some medicine for gas and both Tylenol and Motrin for his pain.

Around 6:00 a.m., Ms. Ewing dressed the children and put them in the car. She then drove around for awhile trying to spot Defendant's car while the victim lay in the back seat. When she could not find Defendant, Ms. Ewing returned home to wait for Ms. Reynolds.

Ms. Ewing admitted that she left out "bits and pieces" in her initial statement to the police. Ms. Ewing said that she wanted to tell the officers just enough so that they would let her go home. She also admitted that she did not mention that Defendant had struck the victim in the abdomen with his fist on Wednesday night. When Detective Smith asked her to take a polygraph test, Ms. Ewing said that she decided to describe all of the events immediately preceding the victim's death including his punishment on Wednesday night.

On cross-examination, Ms. Ewing admitted that she did not have much interaction with the victim when he visited Defendant and was not sure what was or was not normal behavior in the child. Ms. Ewing said that the victim did not like to spend time with her.

Defendant's counsel extensively cross-examined Ms. Ewing about the inconsistencies between her testimony at trial and her statements to the police concerning the sequence of events in the two or three days preceding the victim's death. Ms. Ewing's consistent response was that she did not remember making the statements reflected in the transcript of her interview with Mike Smith, a detective with the Nashville Metropolitan Police Department.

Ms. Ewing also testified on cross-examination that the victim was very thirsty Thursday night but she did not give him anything to drink so that he would not urinate in his pajamas. When the victim got up Friday morning, he still complained of thirstiness, and Ms. Ewing gave him water, juice, milk and Kool-aid. Ms. Ewing noticed the victim's stomach was tight when she rubbed it, but she did not really pay attention. Around 6:30 a.m., Ms. Ewing dressed the victim because he said his stomach was hurting. She then placed the children in her car and drove around looking for Defendant for approximately ten minutes. When they returned home, the victim wanted more water,

and this time he vomited after drinking. Ms. Ewing pushed him into the bathroom in case he vomited again.

The first time Ms. Ewing realized something was seriously wrong with the victim was when Ms. Reynolds arrived and the victim had difficulty walking. Ms. Ewing admitted that she told Ms. Reynolds that the victim was "fine just a minute ago". Ms. Ewing said that she told Ms. Reynolds on Thursday night that the victim had vomited but that she had given him some medicine.

All sudden deaths of children are investigated by the police, and Detective Smith was assigned the victim's case. After the autopsy was completed, the victim's death was classified a homicide, and Detective Smith interviewed Defendant and Ms. Ewing. In his first statement, Defendant denied that his son was sick on Thursday. Defendant admitted that he often roughhoused with the victim, but denied ever hurting the child. Defendant said that he might have accidentally hit the victim in the chest on occasion because the boy squirmed when the two of them tussled. Defendant also told Detective Smith that the victim fell off of his bicycle on both Monday and Tuesday and landed face down in the grass.

After Detective Smith interviewed Ms. Ewing, he again questioned Defendant. At this point, Defendant admitted that on Wednesday night he struck the victim in the chest with his fist and spanked him for throwing the food can. Detective Smith said he arrested Defendant and read him his Miranda warnings. Defendant told Detective Smith that he "lost his cool" when the victim threw the food can but only "jabbed" him in the chest.

Dr. Jennifer Eisenhour was on duty the morning the victim was brought into the hospital. She administered oxygen to the child and then attempted to insert an IV. Before the IV was in place, however, the victim stopped breathing. Dr. Eisenhour said she place a breathing tube into the child's trachea, and he started breathing again. However, during the process, the victim's heart stopped and they were unable to revive him.

Dr. Eisenhour testified that she first believed that the victim was suffering from a perforated appendix or twisted bowel although the extent of swelling in his abdomen was not consistent with that diagnosis. After an x-ray indicated the presence of blood in the abdomen, however, Dr. Eisenhour concluded that the victim's condition was the result of trauma rather than a medical or infectious condition.

Dr. Eisenhour said that when she told the family that the victim had died, Defendant became very upset and struck the door with his fist. Dr. Eisenhour called security because she was worried about Defendant's reaction.

Dr. Eisenhour testified that the autopsy revealed lacerations of both the pancreas and the small intestine. These results were consistent with the victim's physical symptoms and indicated a blunt force trauma to the abdomen. The lacerations permitted the contents of both organs to seep into the abdominal cavity causing swelling, inflamation, blood loss and eventually infection.

Depending on the size of the lacerations, Dr. Eisenhour testified that a person would exhibit symptoms of abdominal swelling, thirstiness and vomiting within twenty-four to forty-eight hours of sustaining the injury. Dr. Eisenhour said, however, that the symptoms might be present in as little as twelve hours and noted that the more significant the bleeding, the more rapidly the symptoms would develop. Dr. Eisenhour did not discuss the timing of the victim's injuries with Dr. John Gerber, the forensic pathologist who performed the autopsy. Dr. Eisenhower said that she based her conclusion as to the timing of the injuries on her clinical findings. Regarding an opinion on the time of injury based upon tissue samples from the autopsy, she would defer to Dr. Gerber. Dr. Eisenhour testified that surgery would have been appropriate if the victim had been brought to the hospital sooner than Friday morning.

On cross-examination, Dr. Eisenhour testified that the abdominal wall of a child is not as developed as an adult's. Therefore, less force is necessary in order for blunt trauma to a child's abdomen to cause the same internal injuries as would be caused to an adult. Abdominal injuries in a child can result from a punch or pushing against a seat belt or striking the handlebar of a bicycle. However, Dr. Eisenhour confirmed that a punch would have to have "some significant driving force behind it" to cause the type of injuries suffered by the victim.

Dr. Gerber performed the autopsy. The autopsy results indicated that the victim's injuries were caused by a blunt force injury to the abdominal region which resulted in a two-inch laceration on the small intestine, a one-inch laceration in the pancreas, and mesenteric hemorrhage. The victim's death was caused by the accumulation of a large amount of fluid in the abdomen which pushed his diaphragm up against his lungs causing the victim's body to go into shock. The state of shock eventually caused the child's heart and lungs to stop functioning. Dr. Gerber testified that a blow to the area identified by Ms. Ewing as the place Defendant struck the victim would cause the injuries that led to the victim's death.

Dr. Gerber testified that the victim's symptoms and injuries were consistent with a blow to the abdomen inflicted between twelve to thirty-six hours prior to death. A twelve-hour time frame would indicate a catastrophic injury while a thirty-six hour time frame would indicate a small laceration in the pancreas and small intestine. Dr. Gerber classified the lacerations on the victim's organs as "medium". Dr. Gerber based the outer limits of this time frame on the number of white blood cells present in the victim's system as well as the extent of the edema.

Dr. Gerber testified that the victim's lack of appetite and energy on Thursday morning, and the increasing severity of his symptoms during Thursday night, including thirstiness, pain, and bouts of vomiting, indicated that the injury was inflicted on Wednesday night rather than Thursday night. If, however, the victim's behavior was normal on Thursday morning as Ms. Reynolds initially told the police, then this factor would not indicate a Wednesday evening injury. Dr. Gerber said that there was an abrasion on the victim's mid-back area with some hemorrhage present beneath the bruising. The abrasion was inflicted within the same time frame that the internal injuries were sustained and could have caused the lacerations to the victim's pancreas and small intestine. Dr. Gerber testified that there was no external sign of injury to the abdomen, and the swelling of the

victim's stomach, in and of itself, did not indicate where the blow was sustained. Dr. Gerber said that the swelling of the victim's stomach would be obvious. Both lacerations were possibly treatable if discovered in time.

At the conclusion of the evidence, the jury found Defendant guilty of first degree felony murder and aggravated child abuse.

## I. Sufficiency of the Evidence

In his appeal, Defendant first contends that the evidence was insufficient to sustain his convictions for felony murder and aggravated child abuse. Defendant argues that the proof that Defendant's blow to the victim's chest on Wednesday night caused the child's death was entirely circumstantial evidence. Defendant contends that the evidence supports the reasonable hypothesis that Ms. Ewing, and not Defendant, caused the injuries that led to the victim's death when she shoved the victim against the couch on Thursday night. Because the facts did not exclude every reasonable hypothesis except Defendant's guilt, Defendant contends that the State failed to prove beyond a reasonable doubt that Defendant committed the charged offenses. Alternatively, Defendant argues that he is guilty at most of child abuse because the evidence does not sustain a finding that Defendant caused the victim to suffer serious bodily injury.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

In order to sustain Defendant's conviction for felony murder, the State was required to prove that Defendant killed the victim in the perpetration of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2). The State need not show that Defendant intended to kill, only that he intended to commit the underlying felony. *Id.* -202(b). Aggravated child abuse is defined as the commission of child abuse when the "act of abuse results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). A person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* -401(a).

"'Serious bodily injury' means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. §39-11-106(a)(34). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or metal faculty[.]"*Id.* -106(a)(2).

In addition, to sustain a conviction for felony murder, the State must show that the killing was "in the perpetration of" aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2). In other words, the killing must be done "in pursuance of the [felony] and not collaterally to it." *State v. Pierce*, 23 S.W.3d 289, 294 (Tenn. 2001) (quoting *Farmer v. State*, 201 Tenn. 107, 115-116, 296 S.W.2d 879, 883 (1956)).

The State may prove a material fact by either direct or circumstantial evidence. *Stinson v. State*, 181 Tenn. 172, 178, 180 S.W.2d 883, 885 (1944). Whether a defendant's conduct proximately caused the victim's death is a question for the jury. *See State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001).

In support of his argument that the evidence was insufficient, Defendant relies on this Court's decision in *State v. Hix*, 696 S.W.2d 22 (Tenn. Crim. App. 1984), *overruled on other grounds, State v. Messamore*, 937 S.W.2d 916, 919 fn. 3 (Tenn. 1996). In *Hix*, the parents of the six-week-old victim took their infant to the hospital because he was crying inconsolably. When the baby was examined, the doctors discovered various injuries, both past and present, that were consistent with child abuse. Neither parent admitted harming their child, and there were no eyewitnesses to any incident that resulted in injury to the baby. Through circumstantial evidence, however, the State showed that the baby's injuries were not inflicted accidentally, and the baby was in the custody of both parents when the injuries were sustained. This Court found these particular facts insufficient to establish that either parent or both parents inflicted the injuries. *Hix*, 696 S.W.2d at 24. This Court concluded that "[t]he reasonable hypothesis which has not been excluded by the evidence in this case is that one of the appellants inflicted the injuries, and the other, for whatever reason, remained silent; hence, the evidence does not prove beyond a reasonable doubt which one committed the crimes." *Id.* at 25.

Unlike the situation before us in *Hix*, however, Defendant admitted that he struck the victim on Wednesday night, and his confession was corroborated by Ms. Ewing's thorough description of the events that transpired that night. Ms. Ewing testified that Defendant was angry with his son after he threw one of the food cans toward the couch where Ms. Ewing sat with Mackenzie. Defendant pulled the victim towards the couch by his shirt until the child was about two inches away from him. Defendant then pulled his fist back even with his shoulder, and struck the victim causing him to stumble backwards three or four steps. Ms. Ewing said she was watching television at the time, that she looked at Defendant once when his fist was pulled back, looked away, and then saw Defendant's fist against the victim when she looked back. Ms. Ewing identified the spot where the victim was struck as between the sternum and the upper part of his stomach.

Ms. Ewing also admitted that she pushed the victim into the couch on Thursday night between 7:00 and 7:30 p.m. with her hand before she retrieved the belt to whip him for soiling his clothes. Shortly after this incident, the victim began vomiting.

Dr. Gerber testified that the blow causing the victim's internal injuries occurred between twelve and thirty-six hours before his death. A blow that would cause death within twelve hours would have to be catastrophic, resulting in lacerations large enough to cause an immediate flooding of the abdominal cavity with the fluids from the injured organs. On the other hand, if death did not occur for thirty-six hours, the blow would have resulted either in an incomplete tear of the organs or a small laceration resulting in a slow accumulation of fluids. The accumulation of fluid would eventually cause the person to suffer from shock which would lead to the cessation of functions in the lungs and heart. Dr. Gerber testified that the victim's increasing lethargy, lack of appetite, thirstiness and bouts of vomiting throughout Thursday as described by both Ms. Reynolds and Ms. Ewing indicated that the fatal blow was delivered Wednesday night. Finally, Dr. Gerber testified that if Defendant hit the child where Ms. Ewing testified he did, this blow would cause lacerations of the small intestine and pancreas.

The jury decides the weight to be given to circumstantial evidence. "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted). The jury was free to reject Defendant's argument that Ms. Ewing's shove on Thursday night led to the victim's death, and this rejection was amply supported by the medical testimony. The fact that there was testimony that another person may have also injured the victim does not preclude the jury from concluding that Defendant's blow to the victim's chest on Wednesday night caused the child's fatal internal injuries. *See State v. Hodges,* 7 S.W.3d 609, 621 (Tenn. Crim. App. 1998). We conclude that there was sufficient evidence for any reasonable jury to find Defendant guilty of aggravated child abuse and felony murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

**II. Failure to Charge the Lesser Included-Offense of Facilitation**

Defendant next contends that the trial court erred by failing to instruct the jury on the lesser included offenses of facilitation of felony murder and facilitation of aggravated child abuse.

Defendant was indicted in May, 2001 on one count of felony murder, one count of second degree murder and one count of aggravated child abuse. During the trial, Defendant requested in writing that the trial court charge the jury on the following lesser-included offenses:
Count 1: Felony murder, second degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide;
Count 2: Second degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide;
Count 3: Aggravated child abuse, knowing aggravated assault, child abuse, reckless

aggravated assault, reckless endangerment, knowing or reckless assault (Class A misdemeanor), knowing assault (Class B misdemeanor).

The State agreed to nolle prosequi count two, second degree murder, and Defendant's trial began on February 11, 2002 on count one, felony murder, and count three, aggravated child abuse. Defendant's defense centered on demonstrating that Ms. Ewing, not Defendant, inflicted the blow that led to the victim's death. During a jury-out hearing, the trial court questioned Defendant about the charge to the jury on lesser-included offenses as follows:

THE COURT: All right, the jurors are ready. About the charge, I am going to charge voluntary manslaughter as a knowing killing of another and the lesser-included of felony murder, so it would be right after murder second. Also, I'm going to charge child abuse on that count.

Now the lessers on Count 2 [sic], I'm going to charge all the ones that [Defendant's counsel] requested except for the B misdemeanor assault, so I'll do the knowing or reckless assault, but not the offensive touching, okay, all right. Now I guess this is a question that I have, and I'll hear you on it, and that is having listened to the testimony, is there anyone who is arguing the theory of criminal responsibility for the conduct of another?

General Miller is shaking her head no.

GENERAL MCEVOY: No, Your Honor.

THE COURT: Okay, what about the defense?

DEFENSE COUNSEL: No, Your Honor.

THE COURT: Okay, so as I understand the defense is that he didn't do it at all, not even–

DEFENSE COUNSEL: I'm glad we've made our defense–that is our defense.

THE COURT: Well, the State's position is that Mr. Cureton did it and I would assume the defense position is that Ms. Ewing did it, but I want to make sure for the charge, I mean, I am required to charge all possible theories. I just want to make sure I'm not missing anything. If I leave that out of the charge, there is not going to be any objection to it.

DEFENSE COUNSEL: No objection and that will be argued.

THE COURT: Correct. No criminal responsibility which means no facilitation charges. All right.

Defendant argues that the trial court is required to instruct the jury on all lesser-included offenses, whether or not Defendant requests such instructions, if the evidence is legally sufficient to support a conviction for the lesser offense. *State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999). The trial in this case began on February 11, 2002. The Tennessee legislature, in 2001, amended Tennessee Code Annotated section 40-18-110 to provide that an instruction as to a lesser-included offense is waived unless the defendant requests in writing, prior to the trial court's charge to the jury, that such an instruction be provided to the jury. Tenn. Code Ann. § 40-18-110(c). This amendment to Tennessee Code Annotated section 40-18-110 governs all trials on or after January 1, 2002. 2001 Tenn. Pub. Acts 338, § 2. Because Defendant did not request an instruction on the lesser included offenses of facilitation of felony murder and facilitation of aggravated child abuse in writing prior to the trial court's charge to the jury, Defendant has not presented a ground upon

which relief may be granted. Tenn. Code Ann. § 40-18-110(c).

Even if the legislature had not amended Tennessee Code Annotated section 40-18-110(c), the trial court's failure to charge the lesser-included offenses of facilitation under the facts presented in this case would not be "plain error" as Defendant argues. Defendant acknowledges in his brief that he did not request the trial court to charge lesser-included offenses of facilitation. He asserts, however, that the trial court's failure to charge the lesser-included offenses is "plain error" in the record, and this entitled him to a new trial. Defendant relies upon this Court's decision in *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994). There are five factors set forth in *Adkisson* which must be considered in order for an appellate court to find plain error: "a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" *Id.* at 641-42 (quoting Tenn. R. App. P. 52(b)).

The absence of at least one factor precludes a finding of plain error. We conclude that factor (d), the accused did not waive the issue for tactical reasons, is not applicable. Defendant's strategy was to put all the blame for the victim's death on Ms. Ewing, and to disassociate himself from all responsibility. This is specifically implied in the colloquy between the trial court, prosecutor and defense counsel concerning the lesser-included offenses to be charged to the jury as outlined above. Therefore, we conclude it was not "plain error" for the trial court to not charge facilitation of felony murder and aggravated child abuse.

Finally, even if the failure to charge the lesser-included offenses of facilitation was "plain error", it was harmless beyond a reasonable doubt. A reviewing court can consider several factors in determining whether error to charge a lesser-included offense is harmless beyond a reasonable doubt. *State v. Allen*, 69 S.W.3d 181, 191 (Tenn. 2002). Among these factors are the defendant's theory of defense, the jury's verdict, and the evidence presented at trial. *Id.*

Defendant's defense was that Ms. Ewing committed the crime. The State did not prosecute Defendant upon the theory of Defendant's criminal responsibility for the acts of Ms. Ewing or any other person. The evidence presented at trial gave the jury the opportunity to accept and accredit testimony that Ms. Ewing's pushing of the victim on Thursday night caused the injury to the victim which resulted in his death. The jury obviously rejected this theory. Important to this analysis, however, is that there is no evidence whatsoever that Defendant facilitated Ms. Ewing's act. Tennessee Code Annotated section 39-11-403(a) defines "facilitation" as follows:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

There is no proof that Defendant knew Ms. Ewing would push or otherwise abuse the victim

on Thursday night.  There is obviously, therefore, no proof that Defendant knowingly furnished substantial assistance to Ms. Ewing when she pushed the victim.

In this particular issue the jury's verdict, standing alone, is neutral.  Thus, we conclude any error was harmless beyond a reasonable doubt.  *Allen*, 69 S.W.3d at 191.

## III.  Cross-Examination of Witness

Defendant next argues that the trial court erred in refusing to allow Defendant to cross-examine Ms. Ewing concerning a comment she made on direct examination about a polygraph test.  In response to the State's questions as to why she had not been truthful initially with Detective Smith, Ms. Ewing testified as follows:

> PROSECUTOR: When you spoke to Detective Smith, did you tell him that Wednesday night, [Defendant] struck [the victim] with his fist?
> MS. EWING: No.
> PROSECUTOR: Okay.  Why didn't you tell him that?
> MS. EWING: Because I didn't want to hurt [Defendant].
> PROSECUTOR: Did Detective Smith continue to question you?
> MS. EWING: Yes.
> PROSECUTOR: At some point, did you tell him that [Defendant] had struck [the victim] with his fist?
> MS. EWING: Yes.
> PROSECUTOR: What made you tell him at that point?
> MS. EWING: Well, I realized how serious it was getting and he also wanted me to take a lie detector test.  I told him okay, but once, if I take that, it was going to have to come out anyways, so I went ahead and told him everything.

After this statement, the State changed its line of questioning and did not explore Ms. Ewing's comment further.  At the conclusion of Ms. Ewing's testimony, the trial court conducted a jury-out hearing during which Defendant requested permission to cross-examine Ms. Ewing about her willingness to take a polygraph test.  The trial court considered Ms. Ewing's statement gratuitous and irrelevant and refused Defendant's request.  After the recess, the trial court instructed the jury that "any comments that you heard earlier about the term lie detector test, any decision to or not to take that, are not admissible in this court and you are to disregard those comments and consider it as though you had never known them."

Defendant argues that the trial court's refusal to permit Defendant to cross-examine Ms. Ewing about her statement violated his constitutional rights to confrontation and to present a defense.  Ms. Ewing was the only person to see Defendant strike the victim on Wednesday night, and her credibility or lack thereof was crucial to Defendant's defense.  Defendant argues that Ms. Ewing's statement implied to the jury that she was willing to take a polygraph test and thus lent her testimony a credibility Defendant contends was unwarranted.

-13-

As Defendant submits, an accused has the right to cross-examine witnesses in order to impeach their credibility. *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). Denial of an accused's right to effectively cross-examine the witnesses presented by the State results in a "'constitutional error of the first magnitude'" and deprives the accused of a basic right essential to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App.1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111, 39 L. Ed. 2d 341 (1974)); *see also Chambers v. Mississippi*, 410 U.S. 284, 295-6, 93 S. Ct. 1038, 1046, 35 L. Ed. 2d 297 (1973). The right to confrontation, however, is not absolute, and "the propriety, scope, manner and control of the cross-examination of witnesses is subject to the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). This Court will not interfere with that discretion absent a clear and plain abuse. *See State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963).

It is well established in Tennessee that the results of a polygraph test are not admissible in evidence. *State v. Irick*, 762 S.W.2d 121, 127 (Tenn. 1988); *State v. Hart*, 911 S.W.2d 371, 377 (Tenn. Crim. App. 1995). Correspondingly, neither an offer to take a polygraph test nor the circumstances surrounding the taking of the test are admissible. *State v. Hartman*, 42 S.W.3d 44, 61-62 (Tenn. 2001); *State v. Adkins*, 710 S.W.2d 525, 528-9 (Tenn. Crim. App. 1985). Any potential error, however, resulting from unsolicited testimony that offers otherwise inadmissible testimony may be cured by a proper instruction to the jury to disregard the comment. *State v. West*, 767 S.W.2d 387, 397 (Tenn. 1989); *State v. Foster*, 755 S.W.2d 846, 849 (Tenn. Crim. App. 1988).

Notwithstanding the trial court's curative instruction, Defendant argues that he should have been permitted to cross-examine Ms. Ewing about her willingness to take a polygraph test under what has been termed the "good-for-the-goose, good-for-the-gander" rule. *See Spadafina v. State,* 77 S.W.3d 198 (Tenn. Crim. App. 2000). With its underpinnings derived "from the fundamental guarantee of fairness," the rule is invoked in criminal cases in those situations where one party introduces, or 'opens the door' to, an issue or subject, and the other party is permitted "to question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous . . . examination." *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (citing *People v. Manning*, 182 Ill. 2d 193, 230 Ill. Dec. 933, 695 N.E.2d 423, 433 (1988) (citations omitted)). This is not the situation presented here, however. Ms. Ewing's remark about the polygraph test was an unsolicited and brief comment during a lengthy examination. The State did not pursue her comment, and the trial court gave a curative instruction to the jury to disregard any reference to a polygraph test. Jurors are presumed to follow the trial court's curative instructions. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). Moreover, Defendant exhaustively cross-examined Ms. Ewing about the numerous inconsistencies between her statement to the police and her trial testimony. Based on the facts surrounding this statement, it does not appear that Ms. Ewing's remark affirmatively affected the result of the trial, and any error that may have occurred as a result of Ms. Ewing's statement was harmless. *See* Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

## IV. Prior Bad Acts

Defendant next argues that the trial court erred in denying Defendant's motion to redact portions of his statement to the police pursuant to Rule 404(b) of the Tennessee Rules of Evidence. In his statement, Defendant admitted that he had struck the victim in the chest with his fist a few months prior to the incident giving rise to the charges against him. The trial court conducted a hearing outside the presence of the jury to determine the admissibility of this evidence. Although not entirely clear from the record, it appears that the trial court concluded that Defendant's statements concerning the prior incident constituted essentially background evidence depicting how Defendant disciplined and played with his children. As such, the trial court found that Rule 404(b) was not applicable to this evidence. The trial court denied Defendant's motion to exclude the evidence without stating the material issue to which the evidence was related or whether the probative value of the evidence outweighed any danger of unfair prejudice.

In his first interview with Detective Smith, Defendant described how he punished the victim periodically either by whipping him with a belt on his buttocks or smacking the child's hand with his own hand. Defendant also explained that when he and the victim pretended to box, Defendant would punch the child in the chest or arm, but never hard enough to hurt him. At the conclusion of this session, Detective Smith interviewed Ms. Ewing and discovered that Defendant had previously struck the victim in the chest with his fist. Detective Smith asked Defendant about the incident at the beginning of his second interview and Defendant responded, "[t]hat was a long while back though, I mean, that's like when he first started having that little behavior problem, you know."

Later, the following exchange took place:

[Detective] Smith: . . . you know . . . you've already told us that you hit [the victim] in the chest.
 [Defendant]: Uh huh.
[Detective] Smith: You didn't tell us. Then you told us you hit him in the chest as a way of disciplining him, like, don't do that again. See . . .
[Defendant]: Uh huh.
[Detective] Smith: . . . you know. And that . . . you didn't tell me that, that you hit him in the chest because we asked about that and you and you . . .
[Defendant]: I've . . . like I said my memory . . .
. . .
[Detective] Smith: . . And you told me that you had hit him in the chest before.
[Defendant]: Once before.
[Detective] Smith: For the same principle . . . if you dish it out . . . am I wrong by saying that? You can dish it out, then you ought to be able to take it. You know, you just told me that a few minutes ago.
[Defendant]: Yeah. But not on every occasion I do that.
[Detective] Smith: Okay. All right. So you hit him in the chest . . . and you failed to tell me that before and I had to . . . and it was brought to your attention by me talking to [Ms. Ewing] . . .

[Defendant]: Uh huh.

[Detective] Smith: . . . and then you said, yeah, I did that too.

[Defendant]: Yes sir.  I'm not going to lie about it.

Defendant argues that the statements constitute propensity evidence relating to Defendant's character rather than a material issue at trial.  Defendant also contends that the danger of unfair prejudice resulting from the statements far outweighs any probative value of the statements.

Although no further illumination is offered in its brief, the State appeared to argue at the trial court hearing that Defendant's statements about the prior blow to the victim's chest were simply general responses to Detective Smith's questions concerning Defendant's method of disciplining his son and constituted, presumably, contextual background evidence.  The State argued that the statements did not contain evidence of a prior act subject to the protective procedures of Rule 404(b) and were otherwise admissible.

A trial court's decision to admit evidence based upon relevancy under Rules 401 and 402 will not be disturbed absent an abuse of discretion.  *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000).  If the relevancy of the proffered evidence is subject to analysis under Rule 404(b), however, our standard of review is based on an abuse of discretion only if the trial court substantially complies with the rule's procedural requirements.  *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).  If the trial court holds a hearing out of the presence of the jury pursuant to Rule 404(b) but fails to state the material issue to which the evidence was relevant or find that the probative value of the evidence outweighs the danger of unfair prejudice, the determination as to the admissibility of the evidence is made by the reviewing court based on the evidence presented at the hearing.  *Id.* at 653.

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."  We note that by its explicit terms, Rule 404(b) applies to the general admissibility of other crimes *or* wrongs *or* acts to prove a person's character in order to show action in conformity with a character trait. In other words, the "act" does not have to be a "crime" or a "wrong" for Rule 404(b) to apply.

In his statement, Defendant admitted striking his son in the chest with his fist as a form of discipline some months before the current offense.  When the State seeks to introduce evidence of a prior incidence of abuse in a child abuse case, the reviewing court must first determine whether the admissibility of the evidence is controlled by Rule 401 or Rule 404(b).  *DuBose*, 953 S.W.2d at 653.  If the defendant is clearly identified as the perpetrator of the earlier abuse, as in this case, admissibility of the evidence is governed by Rule 404(b).  *Id.* at 654.  It is our view, therefore, that Defendant's statements constituted evidence of other acts subject to the procedural protections of Rule 404(b).

We must next determine whether there was a material issue other than conduct conforming to a character trait to which the evidence was relevant, and, if so, whether the probative value of the

evidence outweighs the danger of any unfair prejudice. Tenn. R. Evid. 404(b). Rule 401 states that "relevant evidence" includes that evidence "which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although this threshold of admissibility is relatively lenient, our supreme court has cautioned that "general background evidence used to relate the full story of the offense is rarely probative of an actual material issue at trial." *Gilliland*, 22 S.W.3d at 271; Tenn. R. Evid. 401, Advisory Commission Comments. Background evidence that includes proof of other crimes, wrongful conduct or other acts, however, may be admissible if the contextual evidence is relevant to a material issue at trial other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice. *See Gilliland*, 22 S.W.3d at 272; *State v. Evangeline Combs* and *Joseph D. Combs*, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL 31118329, *50 (Tenn. Crim. App., Knoxville, Sept 25, 2002), *perm. to appeal denied* (Tenn. 2003).

Evidence of other crimes, wrongs or acts may be admissible to show the defendant's intent or motive, the defendant's identity, the absence of mistake or accident if that is the defendant's defense, or the existence of a continuing plan, scheme or conspiracy of which the charged offense is a component. *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985) (citations omitted). To support a conviction for aggravated child abuse, the State must prove that the act of abuse was committed knowingly and not accidentally. When the presence or absence of a particular intent which is necessary to prove the offense is contested, evidence of a prior act of abuse that tends to establish intent may be admissible. *Parton*, 694 S.W.2d, at 303. In the event the defendant claims that the injury was accidentally inflicted, inflicted by someone else, or the defendant lacked the intent to harm the victim, proof that the defendant was responsible for prior acts of abuse may be probative of the defendant's intent to harm the child or to show that the act of abuse was not accidental. *DuBose*, 953 S.W.2d, at 654.

In this instance, Defendant does not deny that he occasionally punished the victim physically or that he hit the victim in the chest on Wednesday night as a form of punishment. Although he disputes Ms. Ewing's identification of the exact location of the blow, Defendant does not claim that he struck the victim accidentally. The crux of Defendant's defense is that the fatal blow was delivered Thursday night when Ms. Ewing had sole custody of the child and that his punishment of the victim on Wednesday did not cause serious bodily injury to the child. The crucial issue at trial, to be determined by the jury, was therefore as follows: Was Defendant's act of hitting the child on Wednesday night the fatal blow, or was Ms. Ewing's act in pushing the victim against the couch on Thursday night the fatal blow? Although the situation in *DuBose* concerned one specific incidence of abuse as opposed to separate acts, the *DuBose* court found that evidence of a prior act of abuse might be admissible if the issue at trial is who delivered the abuse. *Dubose*, 953 S.W.2d at 654.

There was no scientific evidence presented in the case *sub judice* as to the severity of Defendant's prior incident of hitting the victim. However, the clear implication was that the prior blow to the chest was more severe than the normal disciplinary actions taken by Defendant to

punish his son. Defendant admitted that he had the attitude that if the victim "[could] dish it out, then [the victim] ought to be able to take it." Ms. Ewing testified that the fatal blow by Defendant was delivered after the victim threw a can of food at Ms. Ewing and that Defendant was "angry" when the incident occurred. The evidence of the prior act was relevant as to the severity of Defendant's blow to the victim on Wednesday night. The probative value of this evidence outweighed the danger of any unfair prejudice and was therefore admissible. Defendant is not entitled to relief on this issue.

## V. Expert Testimony

Defendant argues that the trial court erred in allowing Dr. Eisenhour to give her opinion as to the timing of the victim's death. Defendant contends that Dr. Eisenhour was not qualified in the field of forensic pathology and submits that Dr. Eisenhour's opinion was unreliable.

Dr. Eisenhour served as the victim's attending physician when he was brought into the hospital on Friday morning. Dr. Eisenhour testified that she was a 1996 graduate of the Medical College of Virginia and specialized in emergency medicine including pediatric and adult emergency care. In addition to being an assistant professor at Vanderbilt University, Dr. Eisenhour attended private patients, spending about one-half of her time at the Vanderbilt Children's Hospital Emergency Department and the other half at the Vanderbilt Adult Emergency Department. At the time of the alleged offense, Dr. Eisenhour worked two shifts a month at the Tennessee Christian Medical Center. Based on her experience, the trial court declared Dr. Eisenhour an expert in the field of emergency medicine.

The testimony that Defendant specifically challenges concerns Dr. Eisenhour's opinion that the injuries to the victim's pancreas and small intestine occurred within twenty-four to thirty-six hours of his death. Defendant contends that Dr. Eisenhour's opinion as to the timing of the victim's injuries is outside her field of expertise.

It is well established that "questions concerning the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A witness who is qualified as an expert in a particular field may testify in the form of an opinion if the scientific, technical or other specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue. Tenn. R. Evid. 702; *see McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). In addition, the evidence offered through the expert must be relevant to a fact at issue in the case. Tenn. R. Evid. 401, 402. A trial court's ruling will not be overturned on appeal unless the reviewing court finds that the trial court abused its discretion in admitting or excluding the expert testimony. *Stevens*, 78 S.W.3d at 832.

Dr. Eisenhour testified that when the pancreas and duodenum are lacerated, the contents of the organs begin to ooze into the abdominal cavity causing the build-up of inflamation and irritation

over time. Based on the victim's physical symptoms at the time he was admitted to the hospital, Dr. Eisenhour testified that the lacerations to his organs were inflicted within twenty-four to thirty-six hours of his death. Dr. Eisenhour based her conclusions on medical literature, her teaching experience, and her background in the emergency care of children. Under cross-examination, Dr. Eisenhour said that she based the time of the injury on her clinical findings as a treating physician and not the pathological examination of tissues performed during autopsy. For that reason, Dr. Eisenhour stated that she would defer to Dr. Gerber "for the autopsy results and the tissue timing there." Dr. Eisenhour also admitted that the injury could have been inflicted within twelve hours of death depending on a number of factors, including the rate of internal bleeding and "oozing" from internal organs, and the status of the victim's underlying immune system.

We find no error in the admission of Dr. Eisenhour's testimony. An emergency treating physician may testify as to the examination of the victim and the victim's cause of death even though he or she is not a forensic pathologist. *State v. Duncan*, 698 S.W.2d 63, 68 (Tenn. 1985). Dr. Eisenhour was qualified as an expert in emergency medicine, including pediatric emergency care, and based her opinion as to the timing of the injuries on her clinical expertise. The fact that Dr. Eisenhour is not a forensic pathologist goes to the weight of her testimony and not to its admissibility. Defendant is not entitled to relief on this issue.

## VI. Sentencing

We note initially that at the time of the sentencing hearing, there were twenty-two statutory enhancement factors listed in Tennessee Code Annotated section 40-35-114. Subsequently, in Public Acts 2002, ch. 849, § 2, the legislature added a twenty-third enhancement factor, but listed it as enhancement factor (1) and renumbered previous factors (1) through (22) as (2) through (23). *See* Tenn. Code Ann. § 40-35-114 (2001 Supp.). In this opinion, we will refer to the enhancement factors of Tennessee Code Annotated section 40-35-114 as they existed at the time of the sentencing hearing.

At the conclusion of Defendant's sentencing hearing for the offense of aggravated child abuse, the trial court found two enhancement factors applicable. First, Defendant abused his position of private trust as the victim's father charged with the child's care and custody. Tenn. Code Ann. § 40-35-114(15). Secondly, the trial court found that Defendant had treated the victim with exceptional cruelty based on the totality of the events occurring on Wednesday and Thursday nights. *Id.* -114(5). Specifically, the trial court pointed to Defendant requiring his four-year-old son to stand for over thirty minutes with arms outstretched and cans taped to his wrists while Defendant watched television. Defendant followed this punishment with a blow to his son's chest or abdominal cavity and then sent the child to bed. On Thursday night, despite repeated requests from Ms. Ewing for Defendant to come home and despite his knowledge that Ms. Ewing's and the victim's relationship was difficult, Defendant remained away from the home all night. The trial court, however, concluded that it placed greater weight on factor 15, abuse of a private trust.

As a mitigating factor, the trial court found factor (11) applicable in that the offense was

committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated Defendant's criminal conduct. Tenn. Code Ann. § 40-35-113(11). The trial court, however, assigned little weight to this factor. The trial court rejected Defendant's request that his cooperation with the police and his lack of substantial judgment because of his youth be considered in mitigation of his sentence, and Defendant does not challenge these findings on appeal. *Id.* - 113(6) and (10). Defendant also argued at the sentencing hearing that his lack of prior convictions, and the fact that his son would not have died from his injuries had Ms. Ewing sought medical treatment when the victim first manifested physical symptoms, were appropriate mitigating factors to be considered in determining the length of his sentence. *Id.* -113(13). The trial court declined to consider these factors noting that, as a general proposition, people are supposed to obey the law. Although the trial court also noted that Ms. Ewing failed to notice the victim's obvious distress, she did request Defendant to come home Thursday night, and Defendant refused to do so.

At the conclusion of the sentencing hearing, the trial court sentenced Defendant to twenty-five years for his conviction for aggravated child abuse and ordered the sentence to run concurrently with Defendant's life sentence for felony murder. In his appeal, Defendant argues that the trial court improperly applied factor (5) as an enhancement factor and erred in not considering Defendant's lack of prior convictions and his steady work history in mitigation of his sentence under factor (13).

When a defendant challenges the length of a sentence, this court conducts a de novo review of the record, with a presumption that the trial court's determinations are correct if the record shows that the trial judge considered the sentencing principles and all relevant facts and circumstances. Tenn. Code Ann. § 40-35-401(d); *State v. Pettus,* 986 S.W.2d 540, 543 (Tenn. 1999). The burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. §40-35-401(d), Sentencing Commission Comments. In reviewing the length of the sentence, this court must consider: (1) the evidence presented at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; and (6) any statements made by Defendant on his own behalf. Tenn. Code Ann. § 40-35-210(b).

Our review of the record reflects that the trial court followed the statutory sentencing procedure and gave due consideration to the sentencing principles and all relevant facts and circumstances. Our review of the sentence imposed by the trial court is therefore *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); *Pettus*, 986 S.W.2d at 543.

Aggravated child abuse of a child under the age of six is a Class A felony. Tenn. Code Ann. § 39-15-402(b). As a Range I offender, Defendant is subject to a sentence of not less than fifteen years nor more than twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If both enhancing and mitigating factors are present, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating

factors. Tenn. Code Ann. § 40-35-210(e).

The weight placed on one factor by the trial court may vary from that assigned to another, and the legislature has specifically declined to assign a numerical value to mitigating and enhancement factors. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; *State v. Spratt*, 31 S.W.3d 587, 606 (Tenn. 2000). The weight accorded enhancing and mitigating factors is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Kelly*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000).

Defendant concedes that a defendant's exceptionally cruel treatment of a victim may be used as an enhancement factor in determining the length of the defendant's sentence for aggravated child abuse. *See State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997) (Proof that the victim suffered serious bodily injury does not preclude a finding that the defendant acted with exceptional cruelty.). Defendant argues, however, that his conduct on Wednesday night did not go beyond the conduct necessary to support a conviction for aggravated child abuse. In other words, his actions on the night in question did not demonstrate "'a culpability distinct from and appreciably greater than that incident to' the crime of [aggravated child abuse.]" *Poole*, 945 S.W.2d at 98 (citing *State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994)). In support of his position, Defendant relies upon this Court's decisions in *State v. Daniel D. Naughton*, No. 02C01-9612-CR-00449, 1998 WL 119509 (Tenn. Crim. App., Jackson, Mar. 18, 1998), *perm. app. denied* (Tenn. Dec. 7, 1998) and *State v. Jeffrey Coffey*, No. M2000-00770-CCA-R3-CD, 2001 WL 178465 (Tenn. Crim. App., Nashville, Feb. 23, 2001), *perm. app. denied* (Tenn. June 18, 2001).

In both cases, we found consideration of factor (5) inappropriate in determining the length of the defendant's sentence primarily because the proof that established the defendant's guilt of aggravated child abuse was the same proof used to sustain a finding that factor (5) was applicable. In *Naughton*, there was some evidence that the infant victim had suffered prior injuries, but the State did not offer any proof that connected the defendant with any injury other than the current injury upon which his conviction for aggravated child abuse was based. *Naughton*, 1998 WL 119509, at *7. Moreover, in *Naughton*, the defendant sought immediate medical treatment. *Id.* Similarly, in *Coffey*, the trial court relied only on the current injuries suffered by the victim's and the long-term effects of those injuries in determining that factor (15) was applicable in enhancing the defendant's sentence. *Coffey*, 2001 WL 178465, at *11. Without proof of long-term or continuous abuse or any unusual type of abuse, the evidence used to support each defendant's conviction for aggravated child abuse was the same evidence used by the trial court to establish the existence of exceptional cruelty. *Id.*

In the case *sub judice*, on the other hand, the trial court specifically considered the nature of the punishment inflicted on the victim shortly before he was struck in the chest in finding that Defendant's conduct evidenced exceptional cruelty. We find that the evidence amply supports the trial court's use of factor (5) to enhance Defendant's sentence. *See State v. Hodges*, 7 S.W.3d 609 (Tenn. Crim. App. 1998) (Consideration of factor (5) permissible where immediately prior to receiving the fatal injuries, the two-year-old victim was made to stand in the corner for hours with

her palms against the wall without the opportunity to sleep, sit down, or use the bathroom, and the defendant failed to seek medical attention as the child's health deteriorated after the infliction of the fatal blows.); *State v. Kerwin L. Walton*, No. 02C01-9610-CR00321, 1997 WL 471169 (Tenn. Crim. App., Jackson, Aug. 19, 1997), *no perm. to app. filed.* (Use of "exceptional cruelty" appropriate where the defendant failed to seek medical treatment for the victim.).

Defendant argues that the trial court erred in not considering his lack of prior convictions in mitigation of the length of his sentence. In addition, Defendant contends that the trial court should have also considered Defendant's employment history although Defendant did not raise his employment at the sentencing hearing. Both a lack of prior convictions and a favorable employment history may be given consideration in determining the length of a defendant's sentence. *See State v. Gutierrez*, 5 S.W.3d 641, 646-47 (Tenn. 1999). This Court has affirmed the use of a defendant's employment history as a mitigating factor "when the defendant's 'performance has surpassed that which is expected of him.'" *State v. Kelly*, 34 S.W.3d 471, 482 (Tenn. Crim. App. 2000) (citing *State v. Randal A. Thies*, No. 02C01-9708-CC-00299, 1998 WL 391813, at *7 (Tenn. Crim. App., Jackson, April 24, 1998)). According to the sentencing report, Defendant's work history is far from stellar and shows a consistent pattern of alternating periods of work and unemployment. Even if the trial court had considered Defendant's lack of prior convictions and employment history as mitigating factors, however, these considerations would be entitled to little weight. Based on the record of this case, a sentence reduction is not warranted.

## CONCLUSION

After a careful review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-22-